**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | **Chapter 13** |
| | : | |
| **KATHYLENE A. MARSHALL,** | : | |
| | : | **Bankruptcy No. 15-18921-AMC** |
| **DEBTOR** | : | |
| | : | |
| **KATHYLENE A. MARSHALL,** | : | |
| | : | |
| **PLAINTIFF** | : | |
| | : | **Adv. Proc. No. 17-00088-AMC** |
| **V.** | : | |
| | : | |
| **YASIR ABDOUN,** | : | |
| | : | |
| **DEFENDANT** | : | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

## I.    INTRODUCTION

In February 2015, the City of Philadelphia ("City") sold real property ("Property") owned by Kathylene Marshall ("Debtor") and her husband to Yasir Abdoun ("Abdoun") at a sheriff's sale, on account of delinquent real estate taxes, for $29,000. During the sale process, the Philadelphia County Court of Common Pleas ("State Court") failed to hold a hearing prior to the issuance of the decree authorizing the sale, as required by Pennsylvania's Municipal Claims and Tax Lien Act ("MCTLA"), 53 P.S. § 7283(a).

Following the sale, the Debtor had nine months from the date of acknowledgment of the sheriff's deed to redeem the Property under state law by paying the purchase price to Abdoun. 53 P.S. § 7293(a). Prior to the expiration of the redemption period, Abdoun impermissibly attempted to collect rent from the Debtor and evict her from the Property on numerous occasions.

1

When the Debtor filed for bankruptcy before the redemption period expired, Abdoun continued his attempts to impermissibly collect rent from the Debtor and filed overstated proofs of claim which improperly included amounts for rent.

In this adversary proceeding, the Debtor seeks to avoid the transfer of the Property to Abdoun as a constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I). Additionally, Debtor seeks to recover damages pursuant to Pennsylvania's Fair Credit Extension Uniformity Act ("FCEUA"), 73 P.S. § 2270.1 *et seq.*, as enforced through Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-9.2, on account of Abdoun's unlawful attempts to collect rent from the Debtor and evict her from the Property prior to the expiration of the redemption period. Finally, the Debtor seeks to hold Abdoun liable pursuant to 11 U.S.C. § 362(k)(1) for violating the automatic stay by attempting to collect postpetition rent after she filed for bankruptcy.

Because the Debtor fails to meet her burden to establish that the Property was transferred for less than its reasonably equivalent value, the Court concludes that the sale of the Property was not a constructively fraudulent transfer subject to avoidance under 11 U.S.C. §548(a)(1)(B)(i)-(ii). However, because Abdoun's egregious and unlawful attempts to collect rent and evict the Debtor violated several provisions of the FCEUA and caused the Debtor ascertainable financial loss, the Court will award the Debtor $300, which represents one-and-a-half times the amount of her actual damages of $200 on account of those claims pursuant to the UTPCPL, 73 P.S. § 201-9.2. The Court will also award reasonable attorneys' fees for litigating and prosecuting the FCEUA claims.

Finally, Abdoun's attempt to collect postpetition rent from the Debtor is not a violation of the automatic stay because 11 U.S.C. §§ 362(a)(1) and (a)(6) only prohibit the collection of prepetition claims.

Based upon the foregoing, Abdoun will hold a total secured claim in the amount of $28,700, which will constitute the amount that the Debtor must pay under her chapter 13 plan to redeem the Property.

## II.    FACTS AND PROCEDURAL BACKGROUND

On March 31, 1997, the Debtor and her now-estranged husband, Raymond Marshall ("Husband"), became owners of the Property, which is located at 715 Cobbs Creek Parkway, Philadelphia, PA, as tenants by the entireties.[1] Ex. S-1. In 2011, after years of physical and mental abuse at the hands of her Husband, the Debtor finally had her Husband permanently and forcibly removed from the Property, following a particularly violent incident. Trial Tr. 34:6-35:4, April 17, 2019 ("Tr."). Although the Debtor believed that her Husband had agreed to pay the real estate taxes on the Property, he failed to do so for several years. *Id.* at 59:20-60:15.

Based upon delinquent real estate taxes against the Property totaling $9,777.13 in 2014, the City filed a petition in State Court for a rule to show cause seeking authorization to sell the Property in order to collect. Ex. S-1; Statement of Facts ("SOF") ¶ 3. The tax information certificate attached to the City's petition reflected that the City had assessed the value of the Property at $76,400. Ex. S-1. On or about July 28, 2014, the State Court issued a rule returnable granting the City's petition to show cause why a decree should not be entered permitting the sale of the Property ("Rule"). Ex. S-2; SOF ¶ 4. Less than six months later, the State Court issued a

---

[1] The deed to the Property was recorded on May 23, 1997. Ex. S-1.

decree permitting the Property to be sold ("Decree") without holding a hearing ("Hearing"), as required by § 7283(a) of the MCTLA. Ex. S-3, S-4; SOF ¶¶ 6, 7.

On or about February 18, 2015, the City sold the Property at a sheriff's sale to Abdoun, the winning bidder, for $29,000. SOF ¶¶ 8, 9. Around the time of the sale, the Debtor's liabilities totaled between $70,000 and $80,000 and, besides the Property, the rest of her assets constituted $5,000 worth of personal property.[2] Tr. 37:7-24.

In March 2015, prior to the acknowledgment of the sheriff's deed, Abdoun went to the Property with his friend and a few police officers when Debtor was not home. SOF ¶ 14; Tr. 36:17-19, 65:23-25, 66:17-21, 79:6-10. When the Debtor's minor son, Demetrius Marshall ("Son"), let the officers and Abdoun in, the officers gave the Son "a piece of paper to give to [his] mother" which reflected that the Property had been sold at a sheriff's sale. Tr. 36:10-24, 66:17-21. The officers left shortly thereafter. Id. at 67:17-18. Meanwhile, Abdoun gave the Son his business card, told him that the Property had been sold, and that he and his mother would have to leave. Id. at 36:10-21, 79:6-14.

After the Son called the Debtor and told her what had happened, she came home and ordered Abdoun and his friend, who were still standing outside, to leave because she was unaware that the Property had been sold. SOF ¶ 15; Tr. 36:8-25. Having her Son call her and tell her that a stranger was claiming to own her home made the Debtor feel physically ill and brought back the anxiety and fear she used to experience when her abusive Husband still lived at the Property. Tr. 47:2-16.

Shortly after Abdoun's first visit, the Debtor went to the Philadelphia Sheriff's Office and learned that her Property had been sold. Id. at 36:22-24. She subsequently started working with

---

[2] It is unclear from the record whether this amount included the delinquent real estate taxes.

Philadelphia Legal Assistance, a federally-funded legal services program providing free legal

services to low-income individuals in Philadelphia, to protect her interest in the Property. *Id.* at

36:24-25, 58:17-23; *Philadelphia Legal Assistance: Providing Free Civil Legal Services to Low-*

*Income Residents of Philadelphia Since 1996,* https://www.philalegal.org/.

On or about March 27, 2015, Jewell Williams, the Sheriff of Philadelphia County,

acknowledged a deed for the Property to Abdoun. Ex. S-6; SOF ¶ 11. On April 8, 2015, the deed

to the Property was recorded. SOF ¶ 12. The state and city transfer tax certifications

accompanying the recorded deed reflected that the Property's "fair market value" at the time of

the sale was $76,400. Ex. S-6.

On April 9, 2015, Abdoun sent the Debtor two identical letters demanding rent even

though the Debtor had never entered into a lease with Abdoun and had never agreed to pay him

rent.[3] Tr. 37:25-38:3, 41:21-23. *See* Ex. P-2, P-3. The rent demand left her scared, overwhelmed,

upset, and anxious because she had been trying to make ends meet and could not afford to pay

rent. Tr. 42:16-25.

In June or July of 2015, Abdoun returned to the Property and called the police when he

saw the Son and his friend sitting on the front step. *Id.* at 67:24-68:3, 79:17-21; SOF ¶ 16. It

appears that Abdoun suggested to the three or four police officers who arrived at the Property

that the Debtor and her Son were squatters in the Property. SOF ¶ 17; Tr. 48:19-49:7, 68:1-18,

79:22-80:2. When the police came to the front door to speak to the Debtor, they became hostile,

accused the Debtor of breaking into the Property, and ordered her to leave. SOF ¶ 19; Tr. 48:15-

25, 68:10-15. In order to prove that she was not a squatter, the Debtor showed the police photo

---

[3] Abdoun sent the same letter twice – once by regular mail and once by certified mail. Tr. 42:16-18.

identification and several bills. Tr. 49:1-7. After demonstrating that she resided at the Property, the police left. *Id.* at 49:5-11.

The encounter between the Debtor and the police took place outdoors on the front step of the Property where her neighbors, bystanders in the community park across the street, and patrons of a nearby bar could see and hear. *Id.* at 49:12-21, 50:15-17. Having the police at her Property humiliated the Debtor, reminding her of the many humiliating public encounters she previously experienced with the police due to her abusive Husband's behavior in prior years. *Id.* at 49:22-50:14.

For approximately six months after the police encounter, the Debtor experienced intense fear that Abdoun would return with the police and force her to leave. *Id.* at 53:13-21, 56:8-14. In fact, she rarely left the Property for fear that the police would lock her out when she was not home. *Id.* at 53:22-54:7. Due to her fear and anxiety, she became impatient, constantly felt "overanxious," struggled to concentrate and sleep, and cried frequently. *Id.* at 54:14-55:23. Her Son observed that she had "a weight on he [sic] back" since she spent many nights after the police encounter crying on the phone to her friends. *Id.* at 71:21-25, 72:10-15.

On December 14, 2015, the Debtor, through counsel, filed a voluntary petition under chapter 13 of the Bankruptcy Code. Case No. 15-18921 ECF No. ("ECF") 1. On January 5, 2016, the Debtor filed her schedules, which identified Abdoun as a secured creditor. *Id.* at ECF 10 Sch. D. On January 14, 2016, the Debtor filed her chapter 13 plan, which provided that, over a five-year period, "[t]he debtor will pay 100% of the allowed secured Claim 2 claim [sic] directly to Mr. Abdoun." *Id.* at ECF 18.

On April 3, 2016, Abdoun filed a proof of claim in the amount of $45,552.11 as a secured claim on the basis that "Debtor lives in Claiments [sic] property" ("Original Proof of Claim").

POC 5-1. The $45,552.11 amount consisted of the $29,000 purchase price, $2,900 in interest, $11,200 of "rent" from February 17, 2015-January 4, 2016, $593 for homeowner's insurance, $1,059.11 for 2016 real estate taxes, and $800 for water. *Id.* at Ex.1. In the Original Proof of Claim, Abdoun averred that his claim was secured and perfected by his ownership interest in the Property and that the value of the Property was $250,000. POC 5-1. The Original Proof of Claim did not include any attachments evidencing Abdoun's ownership interest or the Property's sale.

On June 14, 2016, Abdoun sent the Debtor another letter demanding $800 "for June 2016 rent." Ex. P-1; Tr. 43:3-5. After receiving the letter, the Debtor "cried and prayed and cried and prayed," and believed that she would become homeless because she could not afford the rent demanded by Abdoun. Tr. 43:10-19. She thought that the bankruptcy would protect her from Abdoun's rent demands. *Id.* at 43:3-9. She became even more emotional and upset when her Son dropped out of school, after she received the letter, in order to get a job so that they would not become homeless. *Id.* at 43:10-19.

On March 27, 2017, the Debtor initiated the instant adversary proceeding by filing a complaint against Abdoun seeking to avoid the transfer of the Property in its entirety as a constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I) and to recover the Property pursuant to 11 U.S.C. § 550(a)(1). Case No. 17-88 ECF 1; Compl. ¶ 1. Additionally, the Debtor sought to recover damages for alleged violations of the FCEUA as enforced through the UTPCPL. *Id.*

Alternatively, the Debtor sought to have the Court disallow Abdoun's claim in its entirety on the basis that his Original Proof of Claim contained "no support for an allowed secured claim in any amount" pursuant to Fed. R. Bankr. P. 3001(c)(2)(D)(i). Compl. ¶¶ 62, 63. In the event Abdoun's claim was not disallowed in its entirety, the Debtor sought to have the Court set the

7

redemption amount at $19,000, the alleged value of the Property, according to the Debtor, as of the petition date, and reclassify any excess amount of Abdoun's claim as a general unsecured claim pursuant to 11 U.S.C. § 506(a). *Id.* at ¶ 64.

On April 16, 2019, the day before the trial in this adversary proceeding, Abdoun filed an amended proof of claim in the same amount as the Original Proof of Claim but clarified that his claim was based on the "sheriff's sale" ("Amended Proof of Claim"). POC 5-2. In the Amended Proof of Claim, Abdoun averred that his claim was secured and perfected by the "sheriff's deed" and that the value of the Property was $29,000. *Id.* The Amended Proof of Claim did not include any attachments evidencing Abdoun's ownership interest or the sale of the Property.

At trial on the next day, the Debtor raised an unpleaded claim against Abdoun based upon his alleged willful violation of the automatic stay pursuant to 11 U.S.C. § 362(k)(1) by demanding postpetition rent for June 2016. Tr. 6:19-7:10. Although Abdoun argued that his demand for June rent did not violate the automatic stay, he did not specifically object to the Debtor trying this claim nor did he object to evidence offered in support of such claim. *See id.* at 10:11-23. Abdoun later clarified that "we're only today saying we're only entitled on the -- on the proof of claim $29,000" and clarified that he had no objection to capping his entire prepetition claim at $29,000. *Id.* at 27:9-20. Accordingly, the Court determined that Abdoun's "pre-petition secured claim is at most the $29,000 he paid at the – at the tax sale" because the parties agreed that any amount reflected in the Amended Proof of Claim in excess of $29,000 would be disallowed. *Id.* at 27:21-28:8.

Finally, the Debtor testified that, as a result of Abdoun's visits to the Property, she incurred costs taking public transportation to go to the Philadelphia Sheriff's Office to obtain proof of the sale and to meet with her counsel from Philadelphia Legal Assistance after both of

Abdoun's visits. *Id.* at 56:16-24, 57:12-15. She also paid to obtain a copy of her original deed

and incurred travel costs associated with ordering and picking up her deed. *Id.* at 56:24-57:9. She

further testified that, after receiving the rent letters from Abdoun in April 2015 and June 2016,

she had to pay to take public transportation to meet with her counsel from Philadelphia Legal

Assistance to discuss the letters. *Id.* at 57:10-12. In total, the Debtor testified that these costs

totaled approximately $200. *Id.* at 58:4-16.

At the conclusion of the trial, the Court set a post-trial briefing schedule for the parties to

submit proposed findings of fact and conclusions of law. Case No. 17-88 ECF 17. After seeking

and obtaining multiple extensions of the briefing schedule, the Debtor finally submitted her

proposed conclusions of law on June 10, 2019 and her proposed findings of fact on June 11,

2019.[4] *Id.* at ECF 24, 25. Abdoun submitted his proposed findings of fact and conclusions of law

on July 5, 2019. *Id.* at ECF 26, 27.

On August 21, 2019, the Court requested supplemental post-trial briefing on:

> (1) the standard for determining whether a transfer made pursuant to a defective
> real estate tax foreclosure sale was for reasonably equivalent value in light of the
> Supreme Court's guidance in *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546
> (1994) suggesting that a defective foreclosure sale may only be avoided under 11
> U.S.C. § 548(a)(1)(B) if the price received at the sale was not reasonably
> equivalent to 'the price that would have been received if the foreclosure sale had
> proceeded according to law' AND (2) what price would have been received if the
> real estate tax foreclosure sale of 715 S. Cobbs Creek Parkway, Philadelphia, PA
> 19143 had proceeded in compliance with 53 P.S. § 7283(a). *Id.* at ECF 29.

The parties subsequently agreed to extend their briefing schedule with the Court's permission,

and the Debtor filed her brief on October 7, 2019. *Id.* at ECF 31, 32, 34. Abdoun filed his

---

[4] The pre-trial statement had identified as a legal issue for trial whether Abdoun's conduct violated the Fair Debt
Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* Pre-Trial St. 12 ¶ 4. However, the Debtor's proposed
conclusions of law clarify that the Debtor is not pursuing a claim based on violations of the FDCPA and only seeks
damages based on alleged violations of the FCEUA, as enforced through the UTPCPL, and 11 U.S.C. § 362(k)(1).
*See* Debtor Proposed Concl. of Law ¶¶ 35, 38(a)-(c), 39, 41, 42.

supplemental brief on October 30, 2019. *Id.* at ECF 35. The Debtor did not file a reply brief,

which was due November 14, 2019, as of the date of this Opinion.

The Court has reviewed all post-trial briefing and the matter is ripe for disposition. Both

parties have consented to this Court entering final judgment in this matter. Pre-Trial. St. 1.

## III.    DISCUSSION

The Debtor argues that the presumption established under *BFP v. Resolution Trust Corp.*,

511 U.S. 531 (1994) - that the sale price of property sold at a sheriff's sale constitutes a

property's reasonably equivalent value - does not apply, because the Hearing required to be held

in connection with the sheriff's sale of the Property, pursuant to 53 P.S. § 7283(a), was never

held. Debtor Proposed Concl. of Law ¶¶ 7-12. In the absence of the application of such

presumption, the Debtor argues that the transfer of the Property, which allegedly was worth

$250,000 according to Abdoun in the Original Proof of Claim, for $29,000 was not exchanged

for its reasonably equivalent value and, therefore, constitutes a constructively fraudulent transfer

pursuant to 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I). *Id.* at ¶¶ 13-19.

In response, Abdoun argues that the Property was transferred for a reasonably equivalent

value, because a hearing occurred "by operation of law," the Decree permitting the sheriff's sale

"was valid on it's [sic] face," and, even in the absence of a hearing, Abdoun later amended his

Original Proof of Claim to reflect his belief that the Property was only worth $29,000, which was

the amount that he paid for the Property at the sheriff's sale. Tr. 4:22-5:1; Def. Proposed Concl.

of Law ¶¶ 3, 4.

The Debtor also argues that, by: (1) demanding rent when Abdoun had no legal claim to

rent; (2) unlawfully seeking to have the Debtor removed from the Property prior to the expiration

of the redemption period set forth in 53 P.S. § 7293(a); and (3) filing an inflated proof of claim

seeking rent that he was not owed, Abdoun violated the FCEUA, 73 P.S. § 2270.4(b), entitling

the Debtor to damages under the UTPCPL, 73 P.S. § 201-9.2. Debtor Proposed Concl. of Law

¶¶38(a)-(c), 39, 45. In response, Abdoun argues that, "[w]hen Debtor filed her voluntary chapter

13 bankruptcy the provisions of the automatic stay went into effect pursuant to 11 U.S.C.

§362(a)," presumably suggesting that the postpetition FCEUA claims are preempted by 11

U.S.C. § 362(a). Def. Proposed Concl. of Law ¶ 12.

Finally, the Debtor argues that Abdoun's attempt to collect the June 2016 postpetition

rent ("Postpetition Rent"), which was not authorized under state law and was done with full

knowledge of the Debtor's bankruptcy, constituted a willful violation of the automatic stay.

Debtor Proposed Concl. of Law ¶¶ 41-42. Abdoun responds that his demand for Postpetition

Rent was merely an attempt to collect postpetition insurance and taxes. Tr. 10:11-21.

The Court concludes that, with regard to the § 548 claim, the transfer of the Property was

not constructively fraudulent, because the Debtor failed to demonstrate that the purchase price

was not reasonably equivalent to "the price that would have been received if the foreclosure sale

had proceeded according to law." *BFP,* 511 U.S. at 546. However, the Court also finds that, by

attempting to collect rent and taking nonjudicial action to try to remove the Debtor from the

Property prior to the expiration of the redemption period while the Debtor had the right to

exclusive possession of the Property, Abdoun violated the FCEUA and is liable for damages

under the UTPCPL. However, because the UTPCPL does not allow plaintiffs to recover damages

for emotional distress, the Debtor's damages will be limited to her actual pecuniary losses

resulting from such violations, which total $200, and one-and-a-half times the actual damages,

which will bring Debtor's total recovery on account of Abdoun's FCEUA violations to $300.

11

The Court also concludes that Abdoun's demand for Postpetition Rent did not constitute a willful violation of the automatic stay under § 362(k)(1), because Abdoun's attempt to collect a postpetition claim does not violate the automatic stay. Finally, the Court will set the redemption amount and Abdoun's secured claim at $28,700, offsetting the $29,000 purchase price by the $300 in damages awarded herein. Because the Debtor failed to present any evidence in support of her argument that the value of the Property is $19,000, the Court has no basis for reclassifying any amount of Abdoun's claim as unsecured.

### A. 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I)

The Debtor contends that the sale of the Property constitutes a constructively fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i)-(ii)(I), which provides that:

> (a)(1) the trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.[5]

In order to demonstrate that the transfer of the Property to Abdoun was constructively fraudulent, the Debtor must prove, by a preponderance of the evidence, that (1) she had an interest in the Property; (2) her interest was transferred within two years of the petition date; (3) she was insolvent when the transfer occurred or was made insolvent as a result of the transfer; and (4) she received less than the Property's reasonably equivalent value in exchange for the transfer. *Fid.*

---

[5] Chapter 13 debtors have standing to attempt to avoid transfers in place of the chapter 13 trustee pursuant to 11 U.S.C. § 522(h) in the event the debtor could have exempted property if the trustee had successfully prosecuted the avoidance action so long as (1) the transfer was not voluntary; (2) the transfer was not concealed; (3) the trustee did not attempt to avoid the transfer; (4) the debtor seeks the avoidance pursuant to §§ 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code; and (5) the transferred property is of a kind that the debtor would have been able to exempt from the estate if the trustee had avoided the transfer under one of the provisions of § 522(g). *Ryker v. Current (In re Ryker)*, 301 B.R. 156, 160, n.1 (D. N.J. 2003); *Atkins v. Gelt Props., LLC (In re Atkins)*, 525 B.R. 594, 603 (Bankr. E.D. Pa. 2015); *In re Varquez*, 502 B.R. 186, 190 (Bankr. D. N.J. 2013). Abdoun has not contested the Debtor's standing in this proceeding.

*Bond and Mortg. Co. v. Brand*, 371 B.R. 708, 720 (E.D. Pa. 2007); *Walsh v. Kennelly (In re*

*Kennelly)*, Bankr. No. 08-70348 BM, Adv. No. 08-7032 BM, 2009 WL 8556814, at *2 (Bankr.

W.D. Pa. June 4, 2009).

The Debtor has proven, and Abdoun does not contest, that she had a prepetition interest

in the Property, that her interest was transferred within two years of the petition date, and that

she was either insolvent prior to the transfer or rendered insolvent by the transfer.[6] Ex. S-1; SOF

¶¶ 8, 9; Tr. 34:2-10, 35:20-23, 37:7-24. Accordingly, the Court turns to whether the Debtor has

proven that the Property was transferred for less than its reasonably equivalent value.

### B. Reasonably Equivalent Value of Foreclosed Property and *BFP v. Resolution Trust Corp.*

In *BFP v. Resolution Trust Corp.*, the Supreme Court considered whether a noncollusive,

real estate mortgage foreclosure sale conducted in conformance with applicable state law could

be set aside as a constructively fraudulent transfer under § 548 for having resulted in a sale price

that was less than the property's reasonably equivalent value. *BFP*, 511 U.S. at 533; *Ryker v.*

*Current (In re Ryker)*, 301 B.R. 156, 165 (D. N.J. 2003). In considering this issue, the Supreme

Court recognized that "[m]arket value cannot be the criterion of equivalence in the foreclosure-

sale context...property that *must* be sold within those strictures is simply *worth less.* No one

would pay as much to own such property as he would pay to own real estate that could be sold at

leisure and pursuant to normal marketing techniques." *BFP*, 511 U.S. at 538-39.

The *BFP* court then went on to describe the development of foreclosure law in Anglo-

American jurisprudence, noting that:

> [f]oreclosure laws typically require notice to the defaulting borrower, a substantial
> lead time before the commencement of foreclosure proceedings, publication of a
> notice of sale, and strict adherence to prescribed bidding rules and auction

---

[6] Pursuant to 11 U.S.C. § 101(32)(A), the term "insolvent" refers to a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation..."

13

procedures. Many States require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of a mandatory presale fair-market-value appraisal. When these procedures have been followed, however, it is 'black letter' law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (*under state foreclosure law,* rather than fraudulent transfer law) if the price is so low as to 'shock the conscience or raise a presumption of fraud or unfairness.' *Id.* at 542 (citations omitted).

Ultimately, in light of the foregoing and in deference to "long-established traditions of state regulation" of mortgage foreclosure proceedings, the Supreme Court held that:

> we decline to read the phrase 'reasonably equivalent value'…to mean, in its application to mortgage foreclosure sales, either 'fair market value' or 'fair foreclosure price' (whether calculated as a percentage of fair market value or otherwise). We deem, as the law has always deemed, that a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with. *Id.* at 545-46.

The *BFP* court went on to further explain that:

> [t]his conclusion does not render § 548(a)(2)[7] superfluous, since the 'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context. Indeed, §548(a)(2) will even continue to be an exclusive means of invalidating some foreclosure sales. Although *collusive* foreclosure sales are likely subject to attack under § 548(a)(1), which authorizes the trustee to avoid transfers 'made ... with actual intent to hinder, delay, or defraud' creditors, that provision may not reach foreclosure sales that, while not intentionally fraudulent, nevertheless fail to comply with all governing state laws. Any irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale price of its conclusive force under § 548(a)(2)(A), and the transfer may be avoided if the price received was not reasonably equivalent to the property's actual value at the time of the sale *(which we think would be the price that would have been received if the foreclosure sale had proceeded according to law)*. *Id.* at 545-46 (emphasis added) (citations omitted).

Based upon the foregoing, if there were no irregularities during a foreclosure sale process which would permit invalidation of such sale under state law, a movant seeking to avoid the

---

[7] In 1998, § 548(a)(2) was amended by the Religious Liberty and Charitable Donation Protection Act of 1998 and as a result, the former § 548(a)(2)(A) is now § 548(a)(1)(B). *In re Ryker,* 301 B.R. at 165 n.2.

foreclosure sale as a constructively fraudulent transfer under § 548(a)(1)(B) will be bound by the

presumption in *BFP* that the sale price received at the foreclosure sale is the reasonably

equivalent value of such property. If there were any irregularities during the foreclosure sale

process, however, this presumption will *not* apply.

Instead, the movant must prove, by a preponderance of the evidence, that the foreclosure

sale price was not reasonably equivalent to "the price that would have been received if the

foreclosure sale had proceeded according to law." *Id.* Essentially, the movant must demonstrate

that, if the state law irregularities had not occurred, the foreclosure sale would have yielded a

higher sale price. In other words, the irregularity in the conduct of the foreclosure sale must be

"of such a magnitude that it chilled competitive bidding" and, therefore, "undermined the

fundamental purpose of foreclosure sales." *In re Ryker*, 301 B.R. at 166, 168 (court found that

defective sale notice which listed foreclosure debt as $220,000, when the actual debt on such

property was only $50,000, thwarted competitive bidding and allowed mortgagee, who was the

only party who knew what the amount of the actual debt was, to purchase the property for only

$50,000, and held that the $50,000 foreclosure sale price was not reasonably equivalent to the

price that would have been received if the sale notice had accurately identified the actual

foreclosure debt.).

Furthermore, although the Supreme Court only addressed mortgage foreclosure sales in

*BFP*, numerous courts have since held that *BFP* also applies to real estate tax foreclosure sales

which must be conducted in accordance with state laws that require that tax sales take place

publicly under a competitive bidding procedure and afford protections to delinquent taxpayers

similar to those afforded delinquent borrowers in mortgage foreclosure proceedings, such as

notice, a reasonable opportunity to cure, and strict adherence to statutory requirements. *BFP,* 511

U.S. at 537 n.3. *E.g., Crespo v. Abijah Tafari Immanuel (In re Crespo),* 557 B.R. 353, 360-62

(Bankr. E.D. Pa. 2016) (citing several cases applying *BFP* to tax sales in Pennsylvania and other

jurisdictions); *Balaber-Strauss v. Murphy (In re Murphy),* 331 B.R. 107, 117 (Bankr. S.D. N.Y.

2005); *Hemstreet v. Brostmeyer (In re Hemstreet),* 258 B.R. 134, 138-39 (Bankr. W.D. Pa.

2001); *Golden v. Mercer Cnty. Tax Claims Bureau (In re Golden),* 190 B.R. 52, 58 (Bankr. W.D.

Pa. 1995); *Lord v. Neumann (In re Lord),* 179 B.R. 429, 434-36 (Bankr. E.D. Pa. 1995). The

Debtor acknowledges that *BFP* applies to real estate tax sales conducted pursuant to

Pennsylvania's MCTLA, 53 P.S. §§ 7101-7505, the law under which the sale of the Property was

conducted.[8] *See* Debtor Proposed Concl. of Law ¶¶ 4, 11, 12; Tr. 4:8-21. Therefore, applying the

---

[8]    In any event, Pennsylvania's MCTLA sets forth a comprehensive scheme of requirements which cities of
the first class, such as Philadelphia, must follow to cause real property to be sold due to the property owner's failure
to pay real estate taxes. By its terms, 53 P.S. § 7283(a) requires cities to file a petition for a rule to show cause why
the property should not be sold and to include in the petition the ownership of the property, liens against the
property, and the basis for the city's claim. After the issuance of the rule, the city must also satisfy the county's
Court of Common Pleas at a hearing that (1) service of the rule to show cause was proper, (2) that the rule was
published in at least one newspaper of general circulation in the county and a legal periodical therein, and (3) that
the facts alleged in the petition are true. 53 P.S. § 7283(a).
    Upon the issuance of a decree permitting the sale, 53 P.S. § 7193.2(c) requires the petitioning city to follow
certain rules for serving notice of the decree upon interested parties and to file an affidavit of service evidencing
compliance prior to the sale. Additionally, 53 P.S. § 7283(a) provides that the sale date must be published in at least
one newspaper of general circulation in the county and a corresponding legal periodical. Furthermore, 53 P.S. §7279
sets a minimum bid at the amount of taxes and municipal claims due and potential buyers must offer higher bids up
to the total price they are willing to pay for the property. Ultimately, 53 P.S. § 7283(a) provides that the property be
sold to the highest bidder at the tax sale. Finally, 53 P.S. § 7281 allows any interested person to pay the entirety of
the city's claim at any time prior to the sheriff's sale in order to stop the sale.
    Mortgage borrowers receive similar protections under Pennsylvania law in cities of the first class.
        In Pennsylvania, before a residential mortgage lender may accelerate indebtedness or commence a
        foreclosure action, the lender must give the mortgagor 30 days notice. 41 P.S. §§ 403(a) and (b).
        Thereafter, the lender may file a mortgage foreclosure action which the mortgagor has 20 days to
        answer. Pa.R.Civ.P. 1141, 1018.1(b). If there is no response, the lender obtains a judgment which
        it can enforce by a writ of execution which the lender can obtain from the prothonotary after filing
        a praecipe. Pa.R.Civ.P... 3103. Handbills must be posted on the property and in the sheriff's office
        at least 30 days prior to the sale. Pa.R.Civ.P. 3129.2(b). Written notice must be served upon the
        owner(s), judgment creditors, and other parties with an interest in the property, at least 30 days
        prior to the sale. Pa.R.Civ.P. 3129.2(c). Notice of the sale must also be published once a week for
        three successive weeks in a newspaper of general circulation in the county and in a legal
        publication, if any, designated by the court for publication of notices, the first publication being
        not less than 21 days before the sale. Pa.R.Civ.P. 3129.2(d). The mortgagor may cure at any time
        up to one hour before the sale to prevent the sale. 41 P.C.S.A. § 404. No sale of the property may
        be made unless the upset price is bid... *In re Lord,* 179 B.R. at 435.
Thus, the protections, rights and remedies afforded a delinquent taxpayer under the MCTLA are substantially similar
to those afforded a mortgagor under Pennsylvania's mortgage foreclosure law. *See id.*

principles set forth in *BFP*, the Court will proceed to determine whether the Debtor has satisfied her burden to show that the transfer of the Property was made for less than reasonably equivalent value.

### C. Debtor Has Not Met Her Burden of Demonstrating that the Foreclosure Price Was Not Reasonably Equivalent to the Price That Would Have Been Received At a Regularly Conducted Foreclosure Sale of the Property

The Court finds that the tax sale failed to comply with § 7283(a) of the MCTLA, because the State Court failed to hold the required Hearing before it issued the Decree permitting the Property to be sold. Based upon this irregularity during the tax sale process, the presumption established under *BFP* and related cases, that the sale price received at a tax sale is the reasonably equivalent value of the Property, does not apply. However, in order to prove that the transfer of the Property should be avoided as constructively fraudulent under § 548(a)(1)(B), the Debtor is required, under *BFP,* to prove by a preponderance of the evidence that the price received at the tax sale was not reasonably equivalent to the price that would have been received if the tax sale had proceeded according to Pennsylvania law (*i.e.*, if the hearing had been held prior to the issuance of the Decree permitting the Property to be sold.)*BFP,* 511 U.S. at 545-46; *Washington Mut. v. Fritz (In re Fritz),* 225 B.R. 218, 224-25 (E.D. Wash. 1998); *Ankrah v. HSBC Bank USA, N.A. (In re Ankrah),* 602 B.R. 286, 291 (Bankr. D. N.J. 2019); *Baker v. Nationstar Mortg., LLC (In re Baker),* 574 B.R. 184, 190-91 (Bankr. D. Idaho 2017); *Thorian v. Baro Enters., LLC (In re Thorian),* 387 B.R. 50, 62, 65 (Bankr. D. Idaho 2008).

At trial, the Debtor failed to produce <u>any</u> evidence that would support a finding that the tax sale price would have been higher if the State Court had held the Hearing before it issued the

---

In light of the foregoing, because the rules governing tax foreclosure sales in Philadelphia under the MCTLA provide for competitive bidding and protections to delinquent taxpayers like notice, an opportunity to cure, and strict adherence to statutory requirements, similar to those afforded mortgage borrowers, *BFP* applies to tax sales conducted in accordance with Pennsylvania's MCTLA.

Decree permitting the Property to be sold. *See In re Ankrah,* 602 B.R. at 291; *In re Thorian,* 387

B.R. at 65. Instead, the Debtor based her case on mere speculation that, had the Hearing occurred

prior to the issuance of the Decree, no sale would have occurred. The Debtor provided no basis

for this speculation, nor does this speculation have any impact on the issue which the Debtor has

the burden to demonstrate - whether the Property would have been sold for a higher price if the

Hearing had been held prior to the issuance of the Decree.

Furthermore, the Debtor failed to provide any evidence that, if the Hearing had occurred

prior to the issuance of the Decree, (i) the Debtor could, and would, have bid a higher amount

than Abdoun at the tax sale; or (ii) there were other buyers who would have bid more for the

Property. *See In re Ankrah,* 602 B.R. at 291 ("the debtor acknowledges that a third party

purchased the property, thus there was some competitive bidding...She does not allege that, had

she had notice, she would have bid more than the LLC did. Rather, she alleges that she would

have attempted to further adjourn the sale..."); *In re Thorian,* 387 B.R. at 65. In fact, it is

entirely unclear what effect, if any, the Hearing would have had on the sale price of the Property.

Unlike the facts in *Ryker,* the failure to hold a Hearing did not have any effect on competitive

bidding. In the absence of any evidence from the Debtor that she or someone else could, or

would, have been able to bid a higher amount, the Debtor has failed to satisfy the test set forth by

the Supreme Court in *BFP* for measuring reasonably equivalent value of defective foreclosure

sales. *See In re Ankrah,* 602 B.R. at 291; *In re Thorian,* 387 B.R. at 65.

Based upon Debtor's failure to demonstrate that she did not receive reasonably equivalent

value in exchange for the Property, the Court will not avoid the transfer of the Property as a

constructively fraudulent transfer.

### D. Pennsylvania Fair Credit Extension Uniformity Act/Unfair Trade Practices and Consumer Protection Law

The Court now turns to whether Abdoun's conduct following his purchase of the Property violated the FCEUA, entitling the Debtor to damages under the UTPCPL.[9] By way of background, Pennsylvania's FCEUA prohibits debt collectors and creditors from engaging in unfair or deceptive acts or practices in connection with debt collection. *Baldwin v. Monterey Fin. Servs., Inc.,* No. 3:14-CV-2346, 2017 WL 4767696, at *4 (M.D. Pa. Oct. 20, 2017) (citing *Kaymark v. Bank of Am., N.A.,* 783 F.3d 168, 182 (3d Cir. 2015)). Pursuant to 73 P.S. §2270.4(b), the FCEUA describes certain acts and practices committed by creditors as constituting unfair or deceptive acts or practices.[10] For instance, 73 P.S. § 2270.4(b) provides that:

> it shall constitute an unfair or deceptive act or practice under this act if a creditor violates any of the following provisions:
> (4) A creditor may not engage in any conduct the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt.[11]
> (5) A creditor may not use any false, deceptive or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this paragraph…(ii) The false representation of the character, amount or legal status of any debt…(v) The threat to take any action that cannot legally be taken or that is not intended to be taken…(vii) The false representation or implication that the

---

[9] Abdoun does not contest Debtor's standing to pursue her state law consumer protection claims. Due to the nature of the powers vested in chapter 13 debtors and chapter 13 trustees, a chapter 13 debtor has standing concurrent with the chapter 13 trustee to bring non-bankruptcy causes of action in his or her own name on behalf of the estate. *Wilson v. Dollar Gen. Corp.,* 717 F.3d 337, 343 (4th Cir. 2013) (citing five sister circuits reaching the same conclusion, including the Third Circuit Court of Appeals). Chapter 13 debtors remain in possession of property of the estate pursuant to 11 U.S.C. § 1306(b) and are given authority exclusive of the trustee to use, sell, or lease property of the estate in certain circumstances under 11 U.S.C. § 1303. *Id.* at 344. Implicit in the act of possession is the right of a chapter 13 debtor to sue in his own name. *Id.*

[10] Section 2270.3 of the FCEUA defines a "creditor" as "a person…to whom a debt is owed or is alleged to be owed."

[11] A "debt" constitutes an "actual or alleged past due obligation, claim, demand, note or other similar liability of a consumer to pay money, arising…as a result of a purchase, lease or loan of goods, services or real or personal property for personal, family or household purposes…The term also includes any amount owed as a tax to any political subdivision of this Commonwealth." 73 P.S. § 2270.3.

consumer committed any crime or other conduct in order to disgrace the consumer...[12]

(6) A creditor may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this paragraph...(vi) Taking or threatening to take any nonjudicial action to effect dispossession or disablement of property if: (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there is no present intention to take possession of the property; or (C) the property is exempt by law from such dispossession or disablement.

The FCEUA does not provide consumers with an independent private cause of action.

Rather, pursuant to 73 P.S. § 2270.5(a), "[i]f a debt collector or creditor engages in an unfair or

deceptive debt collection act or practice under this act, it shall constitute a violation of

the...Unfair Trade Practices and Consumer Protection Law." Thus, consumers must enforce

violations of the FCEUA using the remedial provision of the UTPCPL, 73 P.S. § 201-9.2.

*Baldwin,* 2017 WL 4767696, at *4; *Levy-Tatum v. Navient & Sallie Mae Bank,* No. 15-3794,

2016 WL 75231, at *9 (E.D. Pa. Jan. 7, 2016); *Benner v. Bank of Am., N.A.,* 917 F. Supp. 2d

338, 359 (E.D. Pa. 2013) ("Since the FCEUA does not provide individuals with the right to

institute private causes of action for violations, individual plaintiffs must use 73 P.S. § 201-9.2,

the remedial provision of the UTPCPL, to obtain relief."). That provision states that:

Any person who...suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful...may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

---

[12] 73 P.S. § 2270.3 defines a "consumer" for purposes of the FCEUA as "[a] natural person residing in this Commonwealth who owes or is alleged to owe a debt or one who has incurred or is alleged to have incurred liability for the debt within this Commonwealth..."

Because FCEUA claims are enforced through the UTPCPL, in order to recover on account of an FCEUA violation, plaintiffs must not only prove that an FCEUA violation occurred, but also the elements necessary to satisfy a UTPCPL claim. *Kaymark,* 783 F.3d at 182; *Salvati v. Deutsche Bank Nat'l Trust Co., N.A.* 575 Fed. Appx. 49, 57 (3d Cir. 2014) ("Salvati's FCEUA claim is premised on the viability of his claim under the remedial provision of the UTPCPL."); *Baldwin,* 2017 WL 4767696, at *4.

To maintain an action under the UTPCPL, plaintiffs must prove that they suffered an ascertainable loss of money or property as a result of conduct prohibited under the UTPCPL, which, pursuant to 73 P.S. § 2270.5(a), includes conduct prohibited under the FCEUA. *Hemphill v. Nationstar Mortg. LLC,* No. 18-2451, 2018 WL 4929864, at *5 (E.D. Pa. Oct. 10, 2018); *Baldwin,* 2017 WL 4767696, at *5; *Levy-Tatum,* 2016 WL 75231, at *9; *Benner,* 917 F. Supp. 2d at 359-60. Only an actual, non-speculative, identifiable loss constitutes an ascertainable loss for purposes of the UTPCPL.[13] *Baldwin,* 2017 WL 4767696, at *5.

### 1.  Wrongfulness of Prepetition Conduct

The Debtor has satisfied all elements necessary for maintaining an FCEUA claim brought under the UTPCPL in connection with Abdoun's prepetition misconduct. First, the Debtor has proven that prepetition, Abdoun committed several unfair or deceptive acts as defined by the FCEUA, 73 P.S. § 2270.4(b), by demanding rent he had no entitlement to, by asserting a right to possession of the Property he did not have, and by attempting to intimidate the Debtor into vacating the Property.[14]

---

[13] Legal fees incurred prosecuting a UTPCPL claim do not qualify as an "ascertainable loss." *Levy–Tatum*, 2016 WL 75231, at *9 ("Merely retaining counsel to sue under the UTPCPL is not an ascertainable loss.").

[14] Third-party purchasers at sheriff's sales for properties sold on account of delinquent real estate taxes hold secured claims for repayment of the amount necessary to redeem the sold property under Pennsylvania's MCTLA. *See In re Pittman,* 549 B.R. 614, 628 (Bankr. E.D. Pa. 2016). The parties here agree that Abdoun was at all relevant times a "creditor" for purposes of the FCEUA as defined by 73 P.S. § 2270.3, and that the Debtor at all relevant times owed Abdoun a secured "debt" for repayment of the amount necessary to redeem the Property under state law, making her

Under Pennsylvania law, pursuant to the MCTLA, the owner of a property sold pursuant to a tax claim retains the right to redeem the property within nine months of acknowledgement of the sheriff's deed issued in connection with the sale provided that the property was continuously occupied by the same person or family unit as a residence for ninety days prior to the sale and continued to be occupied on the date of acknowledgment of the sheriff's deed. 53 P.S. § 7293(a), (c); *In re Pittman,* 549 B.R. 614, 616-17 (Bankr. E.D. Pa. 2016). During the redemption period, the owner may continue in possession of the property and the purchaser merely holds defeasible title in the property, subject to the owner's right to redeem and possess the property until the redemption period expires. *In re Pittman,* 549 B.R. at 620-24 (discussing numerous Pennsylvania cases finding owner retains possession of the property during the redemption period); *In re Gonzalez,* 550 B.R. 711, 717 (Bankr. E.D. Pa. 2016).

Here, the redemption period spanned from March 27, 2015, the date of acknowledgment of the sheriff's deed, through December 27, 2015. Abdoun's prepetition actions to obtain possession of the Property and rent occurred prior to the expiration of the redemption period while Debtor retained the exclusive right to possess the Property. Therefore, by falsely claiming that he was entitled to possession and rent on multiple occasions, Abdoun misrepresented the character and legal status of the debt in violation of 73 P.S. § 2270.4(b)(5)(ii).

Additionally, by threatening to collect rent that he was not owed, Abdoun threatened to take action that he would not have been legally entitled to take, in violation of 73 P.S. §2270.4(b)(5)(v). Furthermore, by enlisting the police to facilitate the ejectment of the Debtor from the Property, Abdoun took "nonjudicial action to effect dispossession...of property" when there was "no present right to possession of the property claimed as collateral through an

---

a "consumer" for purposes of the FCEUA as defined by 73 P.S. § 2270.3. Debtor Proposed Concl. of Law ¶¶ 35, 36, 37; Def. Proposed Concl. of Law ¶ 11.

enforceable security interest" in violation of 73 P.S. § 2270.4(b)(6)(vi)(A). Abdoun's use of the police to attempt to have Debtor removed from the Property also violated 73 P.S. §2270.4(b)(5)(vii), because it falsely implied that the Debtor had committed a crime by remaining in the Property when she had not. Based upon the foregoing, Abdoun clearly committed numerous prepetition acts prohibited by the FCEUA.[15]

Second, as required to recover under the UTPCPL in connection with FCEUA violations, the Debtor has shown that she suffered "an ascertainable loss" of money as a result of Abdoun's wrongful prepetition conduct. As a result of Abdoun's first visit to the Property, the Debtor incurred costs associated with taking public transportation to the Philadelphia Sheriff's Office to obtain information about the sale, taking public transportation to meet with the legal aid attorney she had retained to help protect her interest in the Property, and obtaining a copy of the original deed to the Property. Additionally, the April 2015 rent demand caused her to incur public transportation costs meeting with her legal aid attorney regarding the letter. Finally, the police attempting to remove the Debtor from the Property caused her to incur public transportation costs visiting her legal aid attorney about the incident. These costs amounted to approximately $200 in out-of-pocket costs expended to address Abdoun's wrongful conduct.[16] Therefore, because the Debtor has demonstrated that Abdoun's wrongful conduct caused her to suffer an ascertainable loss of money, the Debtor is entitled to recover damages on account of Abdoun's prepetition FCEUA violations. Before assessing these damages, the Court will consider whether the Debtor may also recover on account of Abdoun's postpetition actions which may have violated the FCEUA.

---

[15] Abdoun has never attempted to meet his burden to show that any of the defenses set forth in 73 P.S. § 2270.5(d) apply to him.

[16] None of these costs relate in any way to the filing or prosecution of this adversary proceeding.

## 2. Wrongfulness of Postpetition Conduct

The Debtor also seeks to recover under the FCEUA through the UTPCPL on account of Abdoun wrongfully filing an inaccurate proof of claim, which included rent he was never entitled to collect, and continuing to demand rent postpetition. Ultimately, the Debtor's FCEUA claim based on Abdoun's inflated proof of claim is not cognizable under the UTPCPL because she has offered no evidence that she incurred an ascertainable loss of money or property as a result of Abdoun filing an inflated proof of claim. While the Court recognizes that it is possible, and even likely, that the Debtor incurred out-of-pocket costs related to challenging the inflated proof of claim, she never articulated what those costs were. As a result, she has failed to meet her burden to establish an element necessary for recovering under the UTPCPL. Therefore, the Court concludes the FCEUA claim based on Abdoun's inaccurate proof of claim is non-actionable on that basis.

However, the Debtor has satisfied all elements necessary to recover under the FCEUA through the UTPCPL on account of Abdoun's Postpetition Rent demand. Contrary to Abdoun's position, this claim is not preempted by 11 U.S.C. § 362. In general,

> [f]ederal preemption of state law causes of action is appropriate if Congress expressly legislates such preemption, or if Congressional intent can be implied from the federal legislation. If Congress has legislated comprehensively and occupied an entire field of regulation, leaving no room for supplemental state regulation, preemption is implied. Preemption is also implied if state law interferes with the accomplishment and execution of Congressional objectives. *Raymark Indus., Inc. v. Baron*, No. CIV. 96–7625, 1997 WL 359333, at *9 (E.D. Pa. June 23, 1997) (citations omitted).

Ultimately, "[t]he vast majority of courts that have addressed the issue of the Bankruptcy Code's effect on a plaintiff's state law claims have held that the Bankruptcy Code preempts state law claims that are based upon allegations that the defendant violated the Bankruptcy Code." *Abramson v. Federman & Phelan, LLP (In re Abramson)*, 313 B.R. 195, 197 (Bankr. W.D. Pa.

24

2004). *See also Dougherty v. Wells Fargo Home Loans, Inc.,* 425 F. Supp. 2d 599, 609 (E.D. Pa.

2006). Thus, state law claims which are based entirely on a violation of the Bankruptcy Code

generally are preempted. *Nuel v. Capital One, N.A.,* No. 11-2024, 2012 WL 246255, at *1 (E.D.

Pa. Jan. 25, 2012); *Guenot v. Candica LLC,* No. 11-37501, Adv. No. 12-1748, 2014 WL 67320,

at *2 (Bankr. D. N.J. Jan. 2, 2014); *Lisenbach v. Wells Fargo Bank (In re Lisenbach),* 482 B.R.

522, 529 (Bankr. M.D. Pa. 2012); *Abramson,* 313 B.R. at 197. However, "normally, 'state causes

of action are not pre-empted solely because they impose liability over and above that authorized

by federal law.'" *Brundage v. Waite (In re Brundage),* Nos. Civ.A. 05-2310, Civ.A. 05-2406,

2005 WL 2206076, at *4 (E.D. Pa. Sept. 9, 2005) (citing *English v. Gen. Elec. Co.*, 496 U.S. 72,

110 S. Ct. 2270, 110 L.Ed.2d 65 (1990)).

   With these principles in mind, it is clear that the FCEUA claim stemming from Abdoun's

Postpetition Rent demand is not preempted by 11 U.S.C. § 362(a) of the Bankruptcy Code as

Abdoun appears to argue. The FCEUA claim is not based or dependent upon a violation of the

automatic stay at all. *See Dougherty,* 425 F. Supp. 2d at 609 ("merely because a Plaintiff brings a

state law claim in the context of a bankruptcy matter does not justify preemption of those claims,

particularly where the underlying facts of the state law claim are not based on a violation of the

Code.").

   In particular, the Debtor does not argue that Aboun's postpetition attempt to collect rent

constituted an unfair or deceptive act under the FCEUA because the automatic stay prohibited

Abdoun from undertaking collection activity. *See Holloway v. Household Auto. Fin. Corp.,* 227

B.R. 501, 507-08 (N.D. Ill. 1998). Rather, the Debtor argues that Abdoun's Postpetition Rent

demand constituted an unfair or deceptive act under the FCEUA because Abdoun had no

entitlement to rent at that time since the Debtor had properly exercised her right to redeem the

Property and, as a result, Abdoun had not obtained absolute title by June 2016. Thus, the

viability of this FCEUA claim does not depend on the Debtor establishing a violation of the

automatic stay. It merely depends on the Debtor establishing that she properly exercised her

redemption right and that Abdoun was not entitled to collect rent since he did not have absolute

title to the Property. Furthermore, there is no basis to conclude that Aboun could not have

complied with both the FCEUA and 11 U.S.C. § 362(a) in this case. Therefore, this FCEUA

claim is not preempted by 11 U.S.C. § 362(a) of the Bankruptcy Code.

Turning to the merits of the FCEUA claim based upon the June 2016 rent demand, the

Court concludes that Abdoun's attempt to collect rent that he was not owed in June 2016

constituted an unfair and deceptive act under the FCEUA, 73 P.S. § 2270.4, and that the Debtor

suffered an ascertainable loss of money as a result of Abdoun's rent demand, entitling the Debtor

to recover damages under the UTPCPL.

Ultimately, purchasers of properties at tax sales under the MCTLA only obtain absolute

title to the purchased property when the redemption period expires and the owner has taken no

action to exercise the redemption right. *See In re Pittman,* 549 B.R. at 624-25; *In re Terry,* 505

B.R. 660, 663-65 (Bankr. E.D. Pa. 2014); *Hammond v. Allegheny Cnty. Treasurer (In re*

*Hammond),* 420 B.R. 633, 636 (Bankr. W.D. Pa. 2009). As of the petition date, December 14,

2015, the redemption period had not yet expired. Filing the bankruptcy petition extended the

deadline for the Debtor to exercise her right of redemption by at least 60 days pursuant to 11

U.S.C. § 108(b).[17] *In re Gonzalez,* 550 B.R. at 726; *In re Pittman,* 549 B.R. at 629. On January

---

[17] 11 U.S.C. § 108(b) provides:

[e]xcept as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order
entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or
an individual protected under section 1201 or 1301 of this title [11 USCS § 1201 or 1301] may file
any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other
similar act, and such period has not expired before the date of the filing of the petition, the trustee
may only file, cure, or perform, as the case may be, before the later of—

14, 2016, the Debtor exercised her redemption right within 60 days of filing the petition by

providing for the payment of Abdoun's secured claim over time in her chapter 13 plan as she is

permitted to do. *In re Gonzalez,* 550 B.R. at 726; *In re Pittman,* 549 B.R. at 629-31; *In re Terry,*

505 B.R. at 668; *In re Hammond,* 420 B.R. at 636. Once a right of redemption is properly

exercised, either pursuant to procedures under state law or through a chapter 13 plan, neither

Pennsylvania law nor the Bankruptcy Code requires completion of payment of the redemption

amount prior to expiration of the redemption period, and Abdoun does not appear to suggest

otherwise. *In re Pittman,* 549 B.R. at 628-29; *In re Terry,* 505 B.R. at 664-65. Therefore, even

though the Debtor had not paid the full redemption amount by June 2016 when Abdoun

attempted to collect rent from her, he had not yet secured absolute title to the Property because,

by that time, the Debtor had properly exercised her redemption right through her plan.

In light of the foregoing, by sending Debtor a letter to collect rent that she did not owe,

Abdoun made false representations of the character, amount, or legal status of the debt and

threatened to take action that cannot legally be taken in violation of 73 P.S. § 2270.4(b)(5)(ii),

(v). As a result of Abdoun's wrongful conduct, Debtor sustained an ascertainable loss of money

when she paid for public transportation to visit her Philadelphia Legal Assistance attorney

regarding the unlawful letter. Accordingly, the Debtor has satisfied all elements required to

recover damages resulting from the June 2016 demand letter pursuant to the UTPCPL.

### 3.   FCEUA/UTPCPL Damages

Having determined that the Debtor may recover damages pursuant to the UTPCPL, 73

P.S. § 201-9.2, on account of Abdoun's unfair and deceptive acts which violated the FCEUA, the

---

(1) the end of such period, including any suspension of such period occurring on or after the
commencement of the case; or
(2) 60 days after the order for relief.

Court will now consider the appropriate amount of damages. In total, Debtor seeks $15,300 in actual and punitive damages, including $10,000 on account of emotional distress damages, as well as attorneys' fees. The Court concludes, however, that the Debtor is not entitled to any recovery for her emotional distress damages and may only recover damages attributable to her actual pecuniary loss from Abdoun's prohibited conduct. Additionally, the Court may also award reasonable attorneys' fees for enforcing the FCEUA through the UTPCPL.

District courts and bankruptcy courts in this circuit have almost uniformly found that emotional distress damages are not included in the term "actual damages," for purposes of the UTPCPL,[18] reasoning that recovery for emotional distress damages does not fall within the express limitations of 73 P.S. § 201-9.2, which only recognizes as actual damages "any ascertainable loss of money or property."[19] *E.g., King v. Hyundai Motor Mfg. Am.,* No. 1:18-CV-450, 2019 U.S. Dist. LEXIS 1811, at *8 n.2 (M.D. Pa. Jan. 3, 2019); *Sosso v. ESB Bank,* No. 16-367, 2016 WL 3855031, at *5 (W.D. Pa. July 15, 2016); *Yelin v. Swartz,* 790 F.Supp.2d 331, 336

---

[18]     Although the Third Circuit Court of Appeals in *Lansaw v. Zokaites (In re Lansaw),* 853 F.3d 657 (3d Cir. 2017), recently decided that "actual damages" for purposes of 11 U.S.C. § 362(k)(1) include emotional distress damages, *Lansaw* also cautions that:

> [b]ecause the term 'actual damages' has [a] chameleon-like quality, we cannot rely on any all-purpose definition but must consider the particular context in which the term appears. The term has been interpreted in some contexts to include damages for emotional distress and, in others, to only authorize damages for financial harm. *Lansaw,* 853 F.3d at 664.

In determining that emotional distress damages are recoverable as actual damages under § 362(k)(1), the *Lansaw* court reasoned that the legislative history of 11 U.S.C. § 362(a) reflected Congress' intent that the automatic stay protect against non-pecuniary emotional harm, such as harassment and pressure from creditor collection efforts. *Id.* at 667-68. In light of Congress' intent that the stay protect against emotional harm, the Third Circuit found it logical that Congress would intend to include damages resulting from that harm in its definition of "actual damages" when it later introduced 11 U.S.C. § 362(k) as the enforcement mechanism for 11 U.S.C. § 362(a). *Id.* Therefore, cases finding actual damages include emotional distress damages for purposes of § 362(k)(1) are simply inapposite to the question of whether "actual damages" include emotional distress damages for purposes of the UTPCPL.

[19] The only two cases Debtor relies on which address the recovery of emotional distress damages under the UTPCPL, albeit barely, *Dukes v. Firstrust Bank (In re Dukes),* No. 91-15339DWS, Adv. No. 96-1004, 1997 Bankr. LEXIS 2221 (Bankr. E.D. Pa. Nov. 12, 1997), and *Patterson v. Chrysler Fin. Co. (In re Patterson),* 263 B.R. 82 (Bankr. E.D. Pa. 2001), do not convince the Court to depart from the vast weight of authority contradicting the Debtor's position, as neither case offers any explanation whatsoever for concluding in passing that plaintiffs may recover emotional distress damages under the UTPCPL. *In re Patterson,* 263 B.R. at 97; *In re Dukes,* 1997 Bankr. LEXIS 2221, at *48-49.

n.2 (E.D. Pa. 2011); *Weinrich v. Robert E. Cole, P.C.,* No. Civ. A. 00-2588, 2001 WL 4994, at

*6-7 (E.D. Pa. Dec. 22, 2000); *Krisa v. Equitable Life Assurance Soc'y,* 113 F. Supp.2d 694,

706-07 (M.D. Pa. 2000); *Nelson v. First Card,* No. Civ. A. 97-3503, 1998 WL 107236, at *2

(E.D. Pa. March 9, 1998); *Bryant v. Woodland (In re Bryant),* 111 B.R. 474, 479-80 (E.D. Pa.

1990); *Klein v. HSBC Mortg. Servs. (In re Klein),* Bankr. No. 15219 Sr., Adv. No. 10-0015, 2010

WL 2680334, at *3 n.5 (Bankr. E.D. Pa. June 29, 2010). Accordingly, the Debtor may not

recover for emotional distress that she may have suffered as a result of Abdoun's FCEUA

violations.

Nevertheless, the Debtor may recover any out-of-pocket monetary costs attributable to

Abdoun's FCEUA violations. The Debtor credibly testified that she incurred approximately $200

in out-of-pocket expenses as a result of Abdoun's conduct. Therefore, the Court will award her

actual damages in this amount. Additionally, 73 P.S. § 201-9.2 permits the Court to "in its

discretion, award up to three times the actual damages sustained…" The Pennsylvania Supreme

Court has advised that "as a matter of statutory construction…the courts' discretion to treble

damages under the UTPCPL should not be closely constrained by the common-law requirements

associated with the award of punitive damages." *Schwartz v. Rockey,* 593 Pa. 536, 557 (2006).

Ultimately, in exercising their discretion, "courts of original jurisdiction should focus on the

presence of intentional or reckless, wrongful conduct, as to which an award of treble damages

would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL." *Id.*

In light of the Pennsylvania Supreme Court's guidance and Abdoun's misconduct, the

Court finds it appropriate to award one-and-a-half times the actual damages sustained. Abdoun's

multiple attempts to have the Debtor vacate the Property were clearly intentional and wrongful.

In fact, Abdoun made it appear to the police that the Debtor was a squatter when he knew she

29

was not, forcing her to defend herself to the police and humiliating her in front of her neighbors.

Furthermore, Abdoun intentionally and repeatedly continued to demand rent he had no right to

collect. Accordingly, the Court will allow the Debtor an award equal to one-and-a-half times her

actual damages of $200, on account of Abdoun's FCEUA violations, which totals $300.

Finally, 73 P.S. § 201-9.2 provides that "the court may award to the plaintiff, in addition

to other relief provided in this section, costs and reasonable attorney fees." The award of counsel

fees is within the trial court's discretion. *In re Partners Group Fin., LLC,* 394 B.R. 68, 89

(Bankr. E.D. Pa. 2008). Pursuant to 73 P.S. § 201-9.2, courts have awarded legal aid attorneys

employed by organizations which provide free legal assistance fees equal to those awarded to

private members of the bar having similar expertise and experience. *In re Bryant,* 111 B.R. at

480-81. Therefore, the Court will permit a reasonable award of attorneys' fees for litigating and

prosecuting the FCEUA claims in an amount to be determined, if not otherwise agreed to by the

parties, upon motion filed by the Debtor with an opportunity for Abdoun to object.

### E. Violation of the Automatic Stay

The Court next considers Debtor's claim that Abdoun willfully violated the automatic

stay under 11 U.S.C. § 362(k) by demanding that the Debtor pay Postpetition Rent.[20] In

---

[20]    Although the Debtor did not initially include a claim for a willful violation of the automatic stay pursuant
to 11 U.S.C. § 362(k) in her complaint, the Court will treat the complaint as amended to conform to the evidence
presented at trial. Pursuant to Fed. R. Civ. P. 15(b)(2), applicable to bankruptcy proceedings through Fed. R. Bankr.
P. 7015, when an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be
treated in all respects as if raised in the pleadings. To determine if there has been implied consent, the court must
consider "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that
supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial
by consent prejudiced the opposing party's opportunity to respond." *Douglas v. Owens,* 50 F.3d 1226, 1236 (3d Cir.
1995).
    The Court concludes that the § 362(k)(1) claim was tried by implied consent of the parties. First, Abdoun
would have recognized that an unpleaded issue entered the case at trial when prior to the start of trial, the Debtor
informed the Court she intended to try a claim for a willful violation of the automatic stay which she had not
previously pleaded. *See* Tr. 6:19-7:10. Second, evidence supporting the unpleaded claim was introduced at trial
without objection by Abdoun. Third, Abdoun's opportunity to respond to the claim was not prejudiced by allowing
trial on the unpleaded claim to proceed. At trial, Abdoun responded to the additional claim with argument defending
against it. *See id.* at 10:8-23. Furthermore, Abdoun had the opportunity to further respond to the unpleaded claim

particular, the Debtor argues that Abdoun violated the automatic stay provisions under 11 U.S.C.

§§ 362(a)(1), (a)(3) and (a)(6) when he demanded that the Debtor pay the Postpetition Rent.

Debtor Proposed Concl. of Law ¶ 41. By way of background, § 362(a) provides that a

bankruptcy petition operates as an automatic stay against:

> (1) the commencement or continuation, including the issuance
> or employment of process, of a judicial, administrative, or
> other action or proceeding against the debtor that was or could
> have been commenced before the commencement of the case
> under this title, or to recover a claim against the debtor that
> arose before the commencement of the case under this title;…
> (3) any act to obtain possession of property of the estate or of
> property from the estate or to exercise control over property of
> the estate;…
> (6) any act to collect, assess, or recover a claim against the
> debtor that arose before the commencement of the case under
> this title."[21]

Both sections 362(a)(1) and (a)(6) prohibit certain postpetition actions taken by a creditor

in connection with "a claim that arose before the commencement of the case under this title,"

which means a prepetition claim. Here, Abdoun's demand for the Postpetition Rent was taken in

connection with a *postpetition* claim. As a result, Abdoun's Postpetition Rent demand did not

violate either § 362(a)(1) or § 362(a)(6).

---

through his proposed findings of fact and conclusions of law. Therefore, the Court finds Abdoun impliedly
consented to Debtor pursuing her § 362(k)(1) claim. Accordingly, the Court considers the complaint amended to
conform to the evidence presented at trial in that regard.

[21] 11 U.S.C. § 362(a) also provides that a bankruptcy petition operates as an automatic stay against:
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained
> before the commencement of the case under this title; (4) any act to create, perfect, or enforce any
> lien against property of the estate; (5) any act to create, perfect, or enforce against property of the
> debtor any lien to the extent that such lien secures a claim that arose before the commencement of
> the case under this title; (7) the setoff of any debt owing to the debtor that arose before the
> commencement of the case under this title against any claim against the debtor; and (8) the
> commencement or continuation of a proceeding before the United States Tax Court concerning a
> tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may
> determine or concerning the tax liability of a debtor who is an individual for a taxable period
> ending before the date of the order for relief under this title.

In addition, although § 362(a)(3) is not restricted to prepetition claims, it only addresses

acts to obtain possession of, or control over, property of the estate. *See e.g., Denby-Peterson v.*

*Nu2u Auto World (In re Denby-Peterson),* 595 B.R. 184, 191 (D. N.J. 2018) (noting a creditor

who improperly sells estate property commits an act to exercise control over property of the

estate); *In re Johnson,* 601 B.R. 365, 377-78 (Bankr. E.D. Pa. 2019) (finding that creditor who

forced debtor to vacate his residence and disposed of all debtor's personal belongings wrongfully

took possession of and exercised control over property of the estate); *Valez v. EZ Rent a Car*

*Inc., (In re Valez),* 601 B.R. 351, 363-64 (Bankr. M.D. Pa. 2019) (finding that creditor

improperly exercised control over and obtained possession of property of the estate by disabling

and repossessing debtor's vehicle); *Vu v. Lin (In re Vu),* 591 B.R. 596, 603 (Bankr. E.D. Pa.

2018) (finding creditor unlawfully acted to obtain possession of and exercise control over

property of the estate by prematurely locking debtor out of his restaurant and preventing him

from retrieving his personal property contained therein); *Bohm v. Howard (In re Howard),* 422

B.R. 568, 581 (Bankr. W.D. Pa. 2009) (creditor acted to obtain possession of and exercise

control over property of the estate by executing, accepting delivery of, and recording a quitclaim

deed granting herself title and interest in the debtor's mineral rights in certain land).

Clearly, the Postpetition Rent demand made by Abdoun does not constitute an act to

obtain possession of, or control over, property of the estate because Abdoun did not actually take

possession of any property of the estate through the Postpetition Rent demand nor exercise

control over it merely by sending a collection letter. Furthermore, the Debtor has failed to cite

any cases in support of her argument that collection of postpetition claims is prohibited under 11

U.S.C. § 362(a)(3). Rather, Abdoun's Postpetition Rent demand merely was an attempt to *collect*

on a postpetition claim. There are countless cases which specifically prohibit the *collection of*

claims, but they are only prohibited in connection with the collection of prepetition claims under

§ 362(a)(6). *See e.g., Brodgen v. Holmes Motors Inc. (In re Brodgen),* 583 B.R. 527, 533 (Bankr.

M.D. Ala. 2018); *In re Sechuan City, Inc.,* 96 B.R. 37, 39-42 (Bankr. E.D. Pa. 1989) (B.J. Fox);

*In re Aponte,* 82 B.R. 738, 742-43 (Bankr. E.D. Pa. 1988).

### F. Determining Allowed Amount and Status of Abdoun's Prepetition Claim

Finally, the Court will determine the allowed amount and status of Abdoun's claim.

Although the Original Proof of Claim and Amended Proof of Claim failed to attach the writings

upon which Abdoun's claim is based and other writings required by Fed. R. Bankr. P.

3001(c)(1)-(2) ("Rule 3001"),[22] Abdoun has since put forth sufficient evidence to establish the

validity and maximum amount of his prepetition claim.[23]

---

[22] Rule 3001(c) provides:

(1) *Claim based on a writing.* Except for a claim governed by paragraph (3) of this subdivision, when a claim, or an interest in property of the debtor securing the claim, is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

(2) *Additional requirements in an individual debtor case; sanctions for failure to comply.* In a case in which the debtor is an individual:

(A) If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim.

(B) If a security interest is claimed in the debtor's property, a statement of the amount necessary to cure any default as of the date of the petition shall be filed with the proof of claim.

(C) If a security interest is claimed in property that is the debtor's principal residence, the attachment prescribed by the appropriate Official Form shall be filed with the proof of claim. If an escrow account has been established in connection with the claim, an escrow account statement prepared as of the date the petition was filed and in a form consistent with applicable nonbankruptcy law shall be filed with the attachment to the proof of claim.

(D) If the holder of a claim fails to provide any information required by this subdivision (c), the court may, after notice and hearing, take either or both of the following actions:

(i) preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or

(ii) award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

[23] Despite initially seeking an allowed claim in the amount of $45,552.11, Abdoun has since stipulated at trial that he is only entitled to a claim of no more than $29,000. Accordingly, the Court has already determined that Abdoun's prepetition secured claim is, at most, the $29,000 purchase price and that any amount in excess of $29,000 is disallowed.

Under Rule 3001(f), only a proof of claim executed and filed in accordance with Rule 3001 constitutes prima facie evidence of the validity and amount of the claim. In the context of claim objections, the claimant bears the initial burden of establishing the basis for the claim's validity and amount. *See Faulkner v. M&T Bank (In re Faulkner),* 593 B.R. 263, 275 n.4 (Bankr. E.D. Pa. 2018); *In re Henry,* 546 B.R. 633, 634 (Bankr. E.D. Pa. 2016). Once the claimant meets this initial burden, the burden of production then shifts to the objector to offer evidence negating the validity or amount of the claim. *In re Faulkner,* 593 B.R. at 275 n.4; *In re Henry,* 546 B.R. at 635. If the objector satisfies this burden, the ultimate burden of proof remains with the claimant. *In re Faulkner,* 593 B.R. at 275 n.4; *In re Henry,* 546 B.R. at 635. Thus the claimant may, in some cases, need to offer additional evidence to carry its ultimate burden. *In re Faulkner,* 593 B.R. at 275 n.4; *In re Henry,* 546 B.R. at 635. This burden shifting framework applies equally in both contested matters and adversary proceedings. *In re Faulkner,* 593 B.R. at 275 n.4.

Although the Original Proof of Claim and Amended Proof of Claim may not have constituted prima facie evidence of Abdoun's claim since they did not comply with Rule 3001(c)(1)-(2), Abdoun testified at trial that his claim is based upon his purchase of the Property for $29,000 at the sheriff's sale. Tr. 23:4-8. Additionally, Abdoun and the Debtor stipulated to the admission of the writings upon which the claim is based, including the Decree, the State Court docket reflecting the sale, and the sheriff's deed. Ex. S-3, S-4, S-6. Accordingly, Abdoun has satisfied his initial burden of establishing the validity and maximum amount of his prepetition claim through his testimony and these exhibits. The Debtor offered no evidence negating the validity or maximum amount of this claim, aside from evidence offered in support of the avoidance claim, which the Court rejected.[24]

---

[24] Although Rule 3001(c)(2)(D)(i) provides that if the holder of a claim fails to provide any information required by subdivision (c), the court may, after notice and a hearing, preclude the holder from presenting the omitted

34

Satisfied that Abdoun has established the validity and maximum amount of the prepetition claim, the Court now considers whether Abdoun's claim exceeds the Property's value, which the complaint alleged is $19,000, rendering unsecured any portion of the claim in excess of $19,000 pursuant to 11 U.S.C. § 506(a)(1), which provides that:

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property…and is an unsecured claim to the extent that the value of such creditor's interest…is less than the amount of such allowed claim.

This means that "[i]n general, secured claims can be bifurcated into allowed secured and unsecured components, with the secured claim limited by the value of the collateral." *Mahmud v. JTH Inv. Group, LLC (In re Mahmud)*, Bankr. No. 08-10855bf, Adv. No. 08-0175, 2008 WL 8099115, at *3 (Bankr. E.D. Pa. Dec. 4, 2008). In the context of a valuation under § 506(a) where the creditor has satisfactorily established the validity and amount of the claim, as is the case here, the party attempting to modify the secured claim, in this instance, the Debtor, bears the initial burden of proof with regard to valuation. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012). If the challenging party establishes with sufficient evidence that the creditor overvalues the secured claim because the collateral is of insufficient value, the burden then shifts and the creditor bears the burden of persuasion to demonstrate by a preponderance of the evidence the value of the collateral securing its claim. *Id.* at 139-140 ("We now hold that a burden-shifting framework controls valuations of collateral to decide the extent to which claims are secured pursuant to § 506(a).").

---

information as evidence in a contested matter or adversary proceeding unless the court determines the failure was substantially justified or harmless, here, the Debtor never objected to Abdoun's testimony and, in fact, stipulated to the admissibility of the writings upon which the claim is based.

Ultimately, the Debtor offered no evidence at trial that the Debtor's interest in the

Property is worth less than the $29,000 purchase price.[25] Therefore, the Court has no basis upon

which to reclassify any portion of the prepetition claim as unsecured.

## IV.    CONCLUSION

Based upon the foregoing, the Court concludes that Abdoun holds a secured prepetition

claim in the amount of $28,700 which Debtor must pay in order to redeem the Property through

her chapter 13 plan.

Date: February 11, 2020                   _____

                                          Honorable Ashely M. Chan
                                          United States Bankruptcy Judge

---

[25] In fact, the Court even asked the Debtor about the $19,000 valuation at trial, stating: "[s]o are you saying, though, that the amount is – I thought you said it was $19,000…" Tr. 16:7-8. Counsel for the Debtor merely responded: "[t]here – there was a pleading and a complaint about $19,000, but it doesn't relate to the – it doesn't – it's an alternative argument…" *Id.* at 16:11-13. The Debtor never brought up this valuation again during the rest of the trial.